IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 26, 2018

## STATE OF TENNESSEE v. BRADLEY MITCHELL ECKERT

**Appeal from the Criminal Court for McMinn County**
No. 16-CR-261     Andrew M. Freiberg, Judge

_____

### No. E2017-01635-CCA-R3-CD

_____

The Defendant, Bradley Mitchell Eckert, committed three acts of vandalism and one burglary when he was sixteen years old, and the juvenile court granted a motion to transfer the proceedings to criminal court. The trial court found the Defendant guilty of vandalism of property valued at more than $1,000 but less than $2,500; vandalism of property valued at $10,000 or more but less than $60,000; vandalism of property valued at $60,000 or more but less than $250,000; and burglary. After a hearing, the trial court sentenced the Defendant to serve twelve years in prison. The Defendant appeals the juvenile court's decision to transfer the proceedings, and he appeals his sentence. We conclude that there was no abuse of discretion, and we affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Richard Hughes, Jr., District Public Defender; and Donald Leon Shahan, Jr., Assistant Public Defender, for the appellant, Bradley Mitchell Eckert.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Emily Petro, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

The Defendant was sixteen years old and in the custody of the Department of Children's Services ("DCS") as a dependent and neglected child at the time he committed

the offenses. He had just been placed into a new foster home when he and the co-defendant, another foster teen living in the home, committed the acts of vandalism over the course of multiple days. The juveniles first vandalized the van of a convenience store clerk who refused to sell them tobacco. Next, they vandalized a bush hog tractor belonging to Etowah Utilities. The two then entered the premises of East Tennessee Auto Outlet and proceeded to damage over seventy vehicles, some of which were antique and irreplaceable.

## Transfer Hearing

The State sought to transfer the cases against both defendants to criminal court. At the transfer hearing, Ms. Rovanda Davis testified that she was working at a convenience store on February 18, 2016, when the Defendant attempted to buy tobacco without presenting identification around 10:30 p.m. She did not believe the Defendant was old enough to purchase tobacco and refused to sell it to him. Ms. Davis observed that the Defendant and co-defendant remained outside on the premises, and they were still outside shortly before midnight, when Ms. Davis asked the two to leave. After she locked the door at midnight, she heard "a big boom." Ms. Davis exited the building and observed that almost every window in her 2000 Plymouth Voyager was scratched, that two of the windows were broken, and that there was a large dent in the sliding door on the passenger's side. Ms. Davis estimated that the damage would cost over $2,000 to repair. She testified that she had attempted to replace the door but that the vehicle continued to have issues, including a leak.

Mr. Marty Aderhold, a security officer for Etowah Utilities, testified that on Sunday, February 21, 2016, he received information which caused him to check on a John Deere 6430 Premium bush hog tractor parked on County Road 607. Mr. Aderhold testified that the vehicle's windows were shattered, that the hood and hydraulic hose were damaged, and that the interior of the tractor was "completely destroyed," including the computer and two-way radio. The tractor was covered with green and pink tape. The estimated repairs were $21,427.20.

Mr. Scott Cass, the owner of East Tennessee Auto Outlet, testified that on February 20, 2016, he had approximately one hundred cars on the dealership premises as well as several antique cars that were housed in one of the buildings on the property. Mr. Cass was alerted that something suspicious was happening at his dealership, and when he arrived, the lot looked like "a war zone." He testified that glass was everywhere, that there were tires out of place, doors open on cars, and water running. Seventy-one vehicles were damaged, and the damage included body panel damage, broken lights, broken mirrors, broken windows, broken sunroofs, motor oil poured inside vehicles, and a water hose put in the dash of a vehicle to ruin the electronics.

Mr. Cass testified that the building which housed the antique cars was broken into, and the door to the building was damaged. The antique cars in the building sustained irreparable damage. He explained that the vehicles' value included the fact that many had original parts, paint, and windows and that even if the damaged parts were repaired or replaced, the vehicles' value would decrease. He testified that the building contained a 1966 GTO which was worth over $90,000 and which sustained a dented roof, broken windows, and scratches on the paint. The building also contained a Hugger Orange SS Camaro, which was one of only thirty-four cars manufactured. There were nine antique cars in the building which sustained damage.

Mr. Cass further elaborated that some of the damage associated with the vandalism had not been immediately apparent and that he was still discovering damages. For instance, after Mr. Cass replaced the windows on numerous cars, the power window mechanism broke due to small slivers of glass which had lodged in the mechanisms. These damages did not become manifest until after the vehicles had been sold and used by their new owners. Mr. Cass also testified that he sold one car which had sustained imperceptible damage to the spoiler when its back window was broken. The spoiler later fell off as the car was being driven on the interstate. Mr. Cass estimated that the damage to his property was "knocking on" $250,000 and that it was "close to that" amount without factoring in lost wages or lost business. He had video surveillance equipment which captured some of the vandalism as it was occurring, and he turned the footage over to law enforcement.

Detective Blake Witt testified that he interviewed the Defendant and co-defendant regarding the offenses. The Defendant's foster parents were present, and the Defendant chose to waive his right to remain silent. The Defendant acknowledged that between 11:00 p.m. and midnight on February 20, 2016, he and the co-defendant went to the car lot because they were "bored." The Defendant located a gas pipe and started hitting the vehicles. He poured motor oil down the dash of vehicles and threw several rocks at vehicles. He rolled tires down the lot, and they collided with vehicles. The co-defendant committed similar acts of vandalism. They were sitting on a hill when they witnessed police arrive and fled. The Defendant also acknowledged vandalizing the tractor, which he described as a green John Deere tractor. He stated that the tractor was vandalized on February 19th. The Defendant also admitted that on February 18th, when Ms. Davis would not sell him tobacco, he became angry and "took it out on the van." The Defendant identified himself in the surveillance footage as the youth wearing a hat backwards. Detective Witt testified that the vandalism at East Tennessee Auto Outlet was the "most … horrific" he had ever seen and that it was difficult to process the scene because the scope of the evidence Detective Witt had to collect was overwhelming.

Ms. Heather Edmondson, a placement specialist with DCS, testified that the Defendant came into DCS custody as a dependent and neglected child in 2012 because his mother was abusing drugs and could not care for him. He was twelve years old and was placed into a foster home. After the Defendant's mother completed treatment, he was returned to her custody. However, his mother began to abuse methamphetamine again, and the Defendant was returned to DCS custody. At this point, the Defendant also tested positive for drugs, and he was placed into an alcohol and drug treatment program for sixty days, which he successfully completed. Ms. Edmondson stated that the parental rights of the Defendant's parents had been either terminated or surrendered, and that they were no longer legally his parents. She testified that the sixteen-year-old Defendant had "no one" as his family. The Defendant had no prior convictions for delinquent behavior.

Ms. Edmondson also reviewed the options available to treat delinquent youth. She stated that if the Defendant were adjudicated delinquent, she would refer him to a lockdown facility that would have anger management programs, vocational programs, and education. DCS would only have jurisdiction over the Defendant until his nineteenth birthday. After that, he would be released from the juvenile system and have no further supervision. If the Defendant were transferred to criminal court, the transfer would terminate DCS custody, and he would no longer be eligible for DCS services.

Dr. Tom Biller testified as an expert in the field of clinical psychology and in the treatment of youth in state custody. He testified that he examined the Defendant, who was quiet, cooperative, and friendly. The Defendant was finishing the ninth grade. The Defendant told Dr. Biller that his mother's parental rights had been terminated when they both failed a drug test. His father had died in 2010. The Defendant told Dr. Biller that his relationship with his mother was good but that his mother had boyfriends who were abusive to both the Defendant and his mother. Dr. Biller testified that the Defendant had experienced first aural, then visual, then most recently, tactile hallucinations. The Defendant also had a history of abusing drugs and alcohol and had "huffed" paint as well as used other drugs, including marijuana, cocaine, and LSD. The Defendant suffered from panic attacks.

The Defendant scored an 81 on an IQ test, which is in the bottom of the low average range, very close to the borderline deficiency range. Dr. Biller explained that the Defendant's IQ would put him in the tenth percentile. Dr. Biller also diagnosed the Defendant with ADD/ADHD, major depressive disorder with severe psychotic features, panic disorder, agoraphobia, moderate cannabis use disorder, moderate to severe alcohol use disorder, and conduct disorder with adolescent onset, which lends itself to intervention. On the "hand test," the Defendant demonstrated paranoia and distrust of others characteristic of an "assaultive, aggressive, impulsive person." The Defendant had limited resources to control negative impulses and was able to act out hostile responses

with minimal provocation. He demonstrated guardedness, suspicion, emotional deprivation, immaturity, and assaultiveness on the "Draw-A-Person" test. Dr. Biller testified that the Defendant's crimes were "impulsive, thoughtless behavior" but acknowledged the Defendant was capable of premeditation.

Dr. Biller stated that the Defendant did not meet the guidelines for involuntary commitment. In his opinion, the Defendant could be treated through DCS and could be rehabilitated to be a productive citizen instead of a felon. He stated that a lockdown facility would be beneficial for the Defendant because it would be structured and would provide him with training and education. He stated that the adult criminal system would not offer rehabilitative services as the juvenile system would.

On cross-examination, Dr. Biller agreed that the Defendant's impulsive acts were more likely to occur when he was abusing substances. He agreed that understanding the seriousness of the court proceedings would be important to rehabilitation and that the Defendant was in need of supervision for as long as possible.

The State then called Deputy Joshua Lee who testified that during the lunch break in the proceedings, the Defendant and co-defendant began "fist bumping and goofing off, playing around, laughing, cutting up" and then threw objects back and forth against the walls.

The juvenile court found that there was probable cause[1] to believe that the Defendant had committed the acts of vandalism and burglary. *See* T.C.A. § 37-1-134(a)(4) (2016). The juvenile court also found that the Defendant could not be involuntarily committed for mental illness.

In addressing whether the interests of the community required that the juvenile Defendant be put under legal restraint or discipline, the juvenile court found that the Defendant had no prior record of juvenile offenses. *See* T.C.A. § 37-1-134(b)(1). Finding that the Defendant had completed a prior alcohol and drug treatment program but was still abusing alcohol and drugs, the juvenile court concluded that the factor assessing

---

[1] The statute at the time of the June 24, 2016, hearing required a finding of "reasonable grounds" to believe that the acts were committed, and the trial court found that there was "probable cause" to believe that the acts had taken place. *See* T.C.A. § 37-1-134(a)(4) (2016); 2016 Pub. Acts ch. 600, §§ 5-6, eff. July 1, 2016 (changing statutory language to require "probable cause" rather than "reasonable grounds"); *see also State v. Mario A. Reed*, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *10 (Tenn. Crim. App. Aug. 31, 2010) (noting that courts have used "reasonable grounds" interchangeably with "probable cause" in reviewing juvenile transfer decisions).

prior treatment "cuts in both directions." *See* T.C.A. § 37-1-134(b)(2). The juvenile court acknowledged that the Defendant committed only property offenses and that the statute required greater weight to be given to the transfer of offenses committed against the person. *See* T.C.A. § 37-1-134(b)(3). However, the juvenile court ultimately found that the Legislature "at least contemplated the potential transfer of property crimes" and that "the breadth and severity" of the property crimes weighed in favor of transfer "at least to some extent." The juvenile court found that the crimes were committed "in an aggressive and premeditated manner." *See* T.C.A. § 37-1-134(b)(4). First, the juvenile court found that the video evidence of the Defendant and co-defendant destroying cars with a pipe showed aggression. Acknowledging Dr. Biller's testimony that the Defendant's behavior was primarily impulsive, the juvenile court noted that the Defendant was capable of premeditation. The juvenile court concluded that the acts were premeditated because they occurred on three separate dates, and it noted in particular that the vandalism of Ms. Davis's car was an act of retribution showing "some prior reflection and judgment." The juvenile court stated that while one isolated incident of vandalism would appear impulsive, "such repetitive conduct shades toward the existence of premeditation." In addressing the "possible rehabilitation" of the Defendant through services currently available, the juvenile court concluded that rehabilitation using the procedures, services, and facilities available in the juvenile system would not be successful. *See* T.C.A. § 37-1-134(b)(5). The court found no evidence that the conduct was gang-related. *See* T.C.A. § 37-1-134(b)(6).

The juvenile court further noted that the statutory factors were not exclusive, and it made an additional finding that the losses at issue were shocking to the conscience. The juvenile court reiterated that the Defendant engaged in "a pattern of extremely destructive conduct over the span of several consecutive days." The juvenile court also found that the Defendant's behavior in the jail cell during the proceedings indicated "that these proceedings do not matter to him," noting that the victims had given "emotional testimony" just prior to the lunch break when the Defendant and co-defendant were fist-bumping and throwing objects. The juvenile court further found that the Defendant and co-defendant were "loudly conversing with each other" during witness testimony, indicating a lack of respect for the proceedings.

The juvenile court concluded that it would give greater weight to the factors supporting transfer, and it ordered the Defendant to be transferred to criminal court but to remain in the custody of DCS. The juvenile court further found that although the State had established probable cause to believe that the Defendant committed the vandalism against East Tennessee Auto Outlet, the proof at the hearing had shown that the damages sustained were not valued at $250,000 or more. Accordingly, the juvenile court transferred the matter as vandalism of property valued at $60,000 or more but less than $250,000, a Class B felony.

## Trial Proceedings

The Defendant attempted to enter into two plea agreements, both of which were rejected by the trial court. In order to preserve the transfer issue, the Defendant proceeded to a bench trial. The Defendant declined to enter a plea during the trial, and the trial court entered a plea of not guilty on his behalf. *See* Tenn. R. Crim. P. 11(a)(1). The proof at trial was generally consistent with that at the transfer hearing.

Detective Witt testified in further detail regarding his investigation of the crimes, and the Defendant's audio-recorded statement was entered into evidence. In his statement, the Defendant told Detective Witt that he and the co-defendant were bored prior to vandalizing the car lot, that they both came up with the idea of throwing rocks at cars, and that they found a pipe lying on the other side of a building and began to hit cars with it. The Defendant stated that, at the time, they "got a laugh" out of it. He acknowledged breaking into the building on the premises and damaging the antique cars. He stated that he and the co-defendant both participated in the vandalism, which took place between 11:00 p.m. and midnight. The Defendant also acknowledged damaging the tractor on the night before vandalizing cars at the dealership and damaging the van on the night before damaging the tractor. He stated that he and the co-defendant got angry when they were not permitted to buy dipping tobacco. The Defendant characterized his actions as "stupid," and he apologized to his foster parents for sneaking out and committing the offenses. Detective Witt agreed that the co-defendant was committing the bulk of the vandalism caught on camera and that the Defendant apologized and showed remorse in his interview.

Ms. Davis elaborated on her prior testimony that after she refused to sell tobacco to the Defendant, he and the co-defendant remained near the store, asking adults to buy tobacco for them. She testified that approximately fifteen to twenty minutes prior to midnight, she told the two that they had to leave. Around midnight, she heard the bang but could not see anything unusual when she opened the door. After completing paperwork for fifteen to twenty minutes, she discovered the damages to her van. Ms. Davis stated that she spent $1,000 on the parts to fix her van.

Mr. Aderhold testified that the estimated tractor repair was around $21,000, that the two-way radio cost an additional $660 to replace, and that Etowah Utilities was compensated by insurance for all but $1,000 of the damages. The Defendant and co-defendant tied pink and green marking tape around the tractor.

Mr. Cass elaborated on the different antique vehicles that were irreparably damaged in the vandalism. He testified that a glass company set up a mobile home on the lot to attempt the extensive repairs. He estimated there were one hundred and fifty cars

on the lot and that over seventy were damaged. He reiterated that damages were continuing to manifest themselves. He estimated that the damages were between $220,000 and $230,000. Mr. Cass had some vehicles that he had not yet been able to repair due to unavailable parts. Mr. Cass's business was closed entirely for one week. He was paid $148,762.38 by his insurance company to compensate for the damages.

The trial court found the Defendant guilty of vandalism of property valued at more than $1,000[2] but less than $2,500; of vandalism of property valued at $10,000 or more but less than $60,000; of vandalism of property valued at $60,000 or more but less than $250,000; and of burglary. The court noted that the episodes showed an "escalating level of criminality" and a "sustained intent to violate the law."

## Sentencing

At the sentencing hearing, Ms. Sherry Gaston, who compiled the Defendant's presentence report for the Tennessee Board of Probation and Parole, testified that she administered the "Strong-R Needs" assessment to the Defendant. After Ms. Gaston entered his answers to the questions into the computer program, the program indicated his potential for reoffending in the "violent" category was high. She testified that this was in part based on his scores in aggression, employment, and education, which in turn was based partly on information the seventeen-year-old Defendant gave her that he had not had steady employment, that he had not graduated high school, and that he had been in fights with his mother's boyfriends to protect her from abuse. She confirmed that he had no prior record as an adult and stated she was not able to verify his juvenile record. She acknowledged that she did not understand how one might score high in the "general" category of reoffending and that her trainer had not been able to explain it to her.

At sentencing, the victims of the offenses again testified regarding the effect the offenses had on them. Mr. Cass reiterated that damages from the vandalism were continuing to manifest themselves. According to Mr. Cass, two hundred people in the community volunteered to help clean up his lot, and he saw adults cry when they observed the damages. He stated he was still finding glass in the lot. The incident had made Mr. Cass install extra cameras and that he would find himself scanning the cameras for criminal conduct. Mr. Cass felt "violated" by the crime. He testified that he paid for repairs in the amount of $81,237.62 beyond compensation he received from his insurance. According to Mr. Cass's best estimate, the total damages were "over, best we could figure, about a quarter of a million dollars total damage." He had not yet been able to complete repairs on some antique vehicles.

---

[2] The trial court concluded that the value of the labor to repair Ms. Davis's vehicle would put the damages over $1,000.

Mr. Aderhold testified that the bush hog tractor was out of service for over one month and that the repairs "put[] two men out of the job."

Ms. Davis testified that she was having ongoing issues with her van but that she was compensated by the convenience store for the damages. She agreed that "F-U" had been scratched into the glass on her van. Ms. Davis was afraid to return to work and to work at night for approximately one month. However, she stated that she understood that the Defendant had had "a rough life," and she did not blame him. She also testified that the Defendant had spoken to her after the previous court date and had apologized. She said that she forgives the Defendant.

Ms. Audrianna Tilley, the Defendant's foster mother, testified that the co-defendant had been in her home for six months. At first, the co-defendant kept to himself, but he eventually became close to the family, seemed happy, participated in church, and would "goof off" with Ms. Tilley. Ms. Tilley's four-year-old son looked up to the co-defendant. Ms. Tilley testified that the co-defendant appeared to be a "follower," in that he tended to do what other boys his age in the home were doing. The Defendant arrived at her home for a "respite" on a Friday. By Sunday, the two boys had committed the three acts of vandalism. She testified that the co-defendant became more withdrawn and secluded when the Defendant arrived.

Dr. Biller again testified regarding his examination of the Defendant. Dr. Biller stated that in his professional opinion, the Defendant was not malingering. He reiterated his diagnoses regarding the Defendant's mental health and testified that the Defendant also suffered from substance abuse. Dr. Biller testified that the Defendant grew up in a "chaotic" family, in which some of his mother's boyfriends were abusive to him and to his mother. The Defendant attempted to defend his mother from these boyfriends. Dr. Biller testified that the Defendant had just been transferred to a new foster home at the time of the crimes and that he did not have medication because his new family had not had time to take him to see a doctor or to enroll him into a new school. Dr. Biller testified that for a person with the Defendant's mental health issues, these changes would be difficult. He reiterated that the Defendant's IQ was 81, and he noted that an IQ test administered shortly after the Defendant's incarceration yielded a score of 79, which would be in the borderline deficiency range. He testified that the Defendant was more likely to be a follower. Dr. Biller confirmed that the Defendant would be in the bottom ten percent of the population for IQ and that the Defendant had a probable mental age of around thirteen years old at the time of the interview. He agreed with the court that abuse and fear can create anger and that the Defendant's depression, anxiety, and agoraphobia isolated him and increased his fear, anger, and aggression. He stated he believed that the Defendant could be rehabilitated in a supportive milieu. On cross-examination, he agreed

that certain tests he had administered showed that the Defendant had a tendency to assaultiveness, aggressiveness, and impulsive behavior.

The Defendant was seventeen at the time of the sentencing hearing. He testified that he saw his father occasionally when he was young but that his father was shot in the head at a neighbor's house when the Defendant was ten years old. The Defendant was profoundly affected by the death and began using drugs and stopped caring about himself after his father's death. His mother had numerous boyfriends when he was a child. Some were good role models, but some were aggressive. The Defendant recalled one of his mother's boyfriends who would hit the Defendant and his sisters and who would "throw[] [his mother] around," hitting her and verbally abusing her.

The Defendant first came into DCS custody because his mother was addicted to drugs, and he was placed in a foster home. He and his sister were returned to their mother's custody, but he was ultimately returned to DCS custody when his sister was arrested, his mother tested positive for drugs, he tested positive for drugs, and he stole a bicycle. He completed an alcohol and drug rehabilitation program and lived in three different foster homes.

The Defendant stated he was "truly sorry" for his actions and would change them if he could. He wanted to try to provide restitution and told the court, "I have a big heart. I care about people. And I care about what people think about me." He did not want others to think that he did "not have any heart for people's properties" or that he was "just a little savage running around … destroying stuff."

The Defendant acknowledged that he had been present for the co-defendant's sentencing hearing, when the trial judge was "going off… in righteous indignation" regarding the lack of remorse shown by the co-defendant. The Defendant stated that he had apologized to Ms. Davis prior to the other sentencing hearing but that he had not had a chance to apologize to the other victims. He agreed that the video of the dealership showed him laughing as the cars were being destroyed. He testified that the vandalism of the tractor took approximately thirty minutes and that the vandalism of the dealership took one to two hours.

The trial court found that, although the co-defendant was responsible for the bulk of the damage on the video, the Defendant was "neck deep in it and fully involved." Acknowledging Dr. Biller's testimony that the Defendant would not tend to be a leader, the trial court noted that Ms. Tilley had testified that the co-defendant was a follower, and it concluded that in a "shallow pool," the Defendant had become the leader. The trial court noted that the Defendant's laughter in the video indicated a "depraved indifference" and that the video showed only a small portion of the vandalism committed. The trial

court made a finding that the three separate episodes demonstrated a "sustained intent to just violate the laws" and that the crimes "took reflection, thought, care, preparation." Based on Mr. Cass's testimony, it found that the actual damage sustained by Mr. Cass was $250,000. Judging the Defendant's credibility, the trial court found that the Defendant's expressions of remorse were emotionless and were in response to the trial court's prior castigation of the co-defendant for failure to show remorse. Overall, the trial court found that the damages shocked the court's conscience. The trial court found that the Defendant's IQ was in the low-average to borderline range, at approximately the tenth percentile, and that he suffered from ADHD, severe depression with psychotic features, panic disorder, and agoraphobia. However, it also noted that psychological testing indicated assaultiveness and aggression.

The trial court applied as enhancement that the damages inflicted were particularly great and that the Defendant was the leader in the offense. *See* T.C.A. § 40-35-114(2), (6). As mitigation, the trial court found that the Defendant's acts did not cause or threaten serious bodily injury but gave the factor little weight. *See* T.C.A. § 40-35-113(1). The trial court rejected as mitigation the contention that the Defendant lacked substantial judgment in committing the offense because of his youth and that he was suffering from a mental condition that reduced his culpability, concluding that the Defendant demonstrated a sustained intent to violate the law. *See* T.C.A. § 40-35-113(6), (8). The trial court applied as mitigation the fact that the Defendant was disadvantaged by his home life and that he suffered from a mental disease or defect. *See* T.C.A. § 40-35-113(13).

The trial court found that the Defendant was not presumed to be a favorable candidate for alternative sentencing, and it concluded that confinement was necessary to avoid depreciating the seriousness of the offense. *See* T.C.A. § 40-35-102(6), 103(1)(B). In making the finding, the trial court determined that the crime was especially exaggerated and shocking to the conscience, finding that the Defendant had actually committed $250,000 worth of vandalism, which would be a Class A felony, and the court concluded that the exaggerated nature of the offense warranted incarceration. *See State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006).

In determining the length of the sentence, the trial court found that the enhancement factors substantially outweighed the mitigation, and it sentenced the Defendant to twelve years for vandalism of property valued at $60,000 or more but less than $250,000; six years for vandalism of property valued at $10,000 or more but less than $60,000; two years for vandalism of property valued at more than $1,000 but less than $2,500; and four years for burglary. The sentences were ordered to be served concurrently.

## ANALYSIS

The Defendant appeals, arguing that the juvenile court erred in transferring the Defendant to criminal court and that the sentence was an abuse of discretion. The State responds that neither the transfer nor the sentence constituted an abuse of discretion.

### I. Transfer

The Defendant concedes that he was sixteen years old at the time of the offenses, that he received adequate notice and a hearing, that there was probable cause to believe he committed the delinquent acts, and that he was not committable to an institution based on any mental disease or defect. T.C.A. § 37-1-134(a). The Defendant, however, takes issue with the juvenile court's interpretation and balancing of the various factors it weighed in determining whether the interests of the community required him to be put under legal restraint or discipline. The State responds that the juvenile court did not abuse its discretion in determining that a transfer was in the best interests of the community.

The statute governing juvenile transfers provides that after a delinquency petition has been filed, the juvenile court "may transfer the child to the sheriff of the county to be held according to law and to be dealt with as an adult in the criminal court of competent jurisdiction." T.C.A. § 37-1-134(a). The statute further requires that "[t]he disposition of the child shall be as if the child were an adult if:" (1) as applied to this case, the child was at least sixteen at the time of the offense, (2) a hearing was held in conformity with statue, (3) the notice requirements were met, and (4) the court finds probable cause to believe that:

(A) The child committed the delinquent act as alleged;

(B) The child is not committable to an institution for the developmentally disabled or mentally ill; and

(C) The interests of the community require that the child be put under legal restraint or discipline.

T.C.A. § 37-1-134(a) (2016). Accordingly, a transfer from juvenile court to criminal court is discretionary unless the three grounds in subsections (A)-(C) are established. *Howell v. State*, 185 S.W.3d 319, 329 (Tenn. 2006). The statute also requires the court to consider certain factors in determining whether transfer is appropriate:

(b) In making the determination required by subsection (a), the court shall consider, among other matters:

(1) The extent and nature of the child's prior delinquency records;

(2) The nature of past treatment efforts and the nature of the child's response thereto;

(3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(4) Whether the offense was committed in an aggressive and premeditated manner;

(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and

(6) Whether the child's conduct would be a criminal gang offense, as defined in § 40-35-121, if committed by an adult.

T.C.A. § 37-1-134(b) (2016).

This court has previously stated that in reviewing a transfer decision, we do not evaluate the preponderance of the evidence but review to determine whether there are reasonable grounds or probable cause to support the decision to transfer. *See State v. Strickland*, 532 S.W.2d 912, 920 (Tenn. 1975); *Mario A. Reed*, 2010 WL 3432663, at *6, 10 (noting that the terms "probable cause" and "reasonable grounds" are used "interchangeably" in juvenile transfer analysis); *State v. Nathaniel Lee Jackson & Kenneth L. Jones*, No. M2002-02248-CCA-R3CD, 2004 WL 1402555, at *9 (Tenn. Crim. App. June 7, 2004). This review is one for abuse of discretion. *State v. Kayln Marie Polochak*, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at *38 (Tenn. Crim. App. Jan. 16, 2015) ("A juvenile court's findings in determining whether reasonable grounds exist to establish the criteria in subsection (a)(4) are reviewed for an abuse of discretion."); *Howard Jefferson Atkins v. State*, No. W2006-02221-CCA-R3-PC, 2008 WL 4071833, at *7 (Tenn. Crim. App. Aug. 29, 2008); *see Howell*, 185 S.W.3d at 329 (noting that if trial counsel's failure to evaluate the defendant's competency were deficient, the court would review "whether the juvenile court's decision to transfer [the defendant] regardless of whether she was committable to an institution would constitute an abuse of discretion"). The juvenile court is allowed "a wide range of discretion" in determining whether to transfer a child from juvenile to criminal court. *Strickland*, 532 S.W.2d at 921.

Here, the juvenile court meticulously made the statutorily required findings. Having found that the Defendant was sixteen years old and had notice of the hearing, the juvenile court found that there was probable cause to believe that the Defendant had committed acts of vandalism and that he was not committable to an institution due to developmental disability or mental illness. In evaluating whether the interests of the community required that the Defendant be put under legal restraint, the juvenile court found that the Defendant had no prior criminal history and no gang affiliation. The court found that the factor regarding past treatment could weigh favorably for the Defendant, in that he had completed a drug program, or could weigh against him, in that he continued to struggle with addiction. While acknowledging that the Legislature had prioritized crimes against the person for transfer, the trial court noted that the property crimes at issue were of exceptional breadth and severity, weighing "to some extent" toward transfer. The juvenile court further found that the crimes were committed in an aggressive and premeditated manner in that they spanned multiple days, required reflection and planning, and were in one case intended as retribution. The juvenile court expressed doubt that the Defendant could be successfully rehabilitated. The court also considered the exaggerated nature of the damages and the testimony that the Defendant appeared not to appreciate the seriousness of the charges.

The Defendant acknowledges in his brief that the juvenile court "did follow the law with regards to the actual procedure used in conducting the transfer hearing." However, the Defendant disagrees with the juvenile court's findings. He argues that he successfully completed substance abuse treatment and that this factor should weigh against transfer. Likewise, he notes that the nature of the offenses, which were property crimes, weighs against transfer. He also disagrees that the acts were premeditated, pointing to Dr. Biller's testimony that his actions would tend to be impulsive and not premeditated. We note that in a transfer hearing, "[t]he trial judge's findings of fact are given the weight of a jury verdict and are conclusive unless we find that the evidence preponderates against these findings." *State v. Chad A. Swatzell*, No. 01-C-019005CC00126, 1992 WL 25008, at *1 (Tenn. Crim. App. Feb. 14, 1992). The court was presented both with evidence that the acts involved premeditation and with testimony that the Defendant's acts were impulsive, and we cannot conclude that the court's findings were in error.

We conclude that the juvenile court considered the statutory factors and made appropriate findings in determining whether transfer was appropriate. *See State v. Brandon Ray Roland*, No. E2002-00927-CCA-R3-CD, 2003 WL 21983024, at *18-19 (Tenn. Crim. App. Aug. 21, 2003) (finding reasonable grounds to support transfer although trial court did not address all statutory factors); *State v. Timothy Ken Sexton*, No. E2000-01779-CCA-R3-CD, 2002 WL 1787946, at *7-8 (Tenn. Crim. App. Aug. 2, 2002) (same); *State v. Cecil L. Groomes*, No. M1998-00122-CCA-R3-CD, 2000 WL

1133542, at *8 (Tenn. Crim. App. Aug. 10, 2000) (upholding transfer when it was "clear from the judge's ruling that he considered the appropriate factors and made the required findings in transferring [the defendant] from juvenile court"). While the Defendant had no prior record, committed only crimes against property, and had no criminal gang associations, the juvenile court gave greater weight to its findings that the acts were aggressive and premeditated and that the Defendant was not amenable to rehabilitation because he had evidenced a sustained intent to violate the law which spanned multiple days. On review, we determine whether reasonable grounds support the transfer. Although the Defendant argues that the transfer of a juvenile to criminal court for a property crime is a harsh result, the trial court ultimately determined that the Defendant maintained a sustained intent to cause damages which would qualify as a Class A felony, and it concluded that the interests of the community required transfer. We conclude that the juvenile court's decision was supported by reasonable grounds and that it did not abuse its discretion.

The Defendant, conceding that a juvenile transfer is largely discretionary, also argues that the transfer statute is void for vagueness. He asserts that the "best interests of the community" is a standard that is so vague that it fails to establish what is prohibited and that it fails to provide explicit standards to prevent arbitrary and discriminatory enforcement. He asserts that the statute's vagueness allowed it to be applied arbitrarily, pointing to the nature of the offenses, his clean record, and his mental limitations.

We observe that the Defendant never raised his constitutional argument below, and it is accordingly waived. *See State v. Howard*, 504 S.W.3d 260, 277 (Tenn. 2016) ("It is well-settled that a defendant may not advocate a different or novel position on appeal."); *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."); *Mario A. Reed*, 2010 WL 3432663, at *9, 11 (concluding that failure to raise errors at juvenile hearing resulted in waiver). Moreover, the Tennessee Supreme Court rejected a vagueness challenge to a prior version of the statute with similar language requiring a finding that "the interests of the community require that the child be placed under legal restraint or discipline." *Strickland*, 532 S.W.2d at 921; T.C.A. 37-234 (1970). The court held that the statute "establishes criteria upon which the juvenile judge is to base his decision on whether to transfer the juvenile to the criminal court, and it adequately informs the parties as to what is to be considered by the judge." *Strickland*, 532 S.W.2d at 921; *see also State v. Tiffany Michelle Taylor*, No. M1999-02358-CCA-R3-CD, 2002 WL 799695, at *10 (Tenn. Crim. App. Apr. 29, 2002) (upholding the statute against a constitutional challenge despite the fact that the term "community" remains undefined). Accordingly, the Defendant has not established that the transfer was error.

## II. Sentencing

The Defendant argues that the trial court erred in setting the length of his sentences because it applied the enhancement and mitigating factors inappropriately. The State responds that the trial court did not abuse its discretion in sentencing the Defendant to twelve years of confinement. Because the Defendant has not shown an abuse of discretion, we affirm the sentences.

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). This court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. This court cannot reverse a sentence based on the trial court's failure to adjust a sentence in "light of applicable, but merely advisory, mitigating or enhancement factors." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The trial court is "to be guided by — but not bound by — any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id.* The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant takes issue with the trial court's finding that he was the leader in committing the offenses. In raising this issue, the Defendant notes that Ms. Tilley was apparently called as a witness at the direction of the trial court and that the trial court questioned Ms. Tilley regarding the Defendant and co-defendant based on her prior testimony in the co-defendant's sentencing hearing. However, the Defendant does not argue that these actions were improper but instead asserts that the trial court committed error in enhancing the sentence based on a finding that the Defendant was the leader despite Dr. Biller's testimony that the Defendant's mental limitations would not make him a leader. *See* Tenn. R. Evid. 614(b) (providing that the trial court may interrogate witnesses). He asserts that the trial court also erred in giving weight to this factor. The Defendant further argues that the trial court erred in refusing to find that his youth was a

mitigating factor, noting Dr. Biller's testimony that his mental age would have been close to thirteen at the time of the crimes. This court defers to a trial court's findings of fact in a sentencing hearing unless the evidence preponderates otherwise. *See State v. Zeolia*, 928 S.W.2d 457, 462 (Tenn. Crim. App. 1996). Even if the Defendant were able to establish that the trial court's findings were in error, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed" unless the trial court wholly departed from the Sentencing Act. *Bise*, 380 S.W.3d at 706. Here, the trial court considered the purposes and principles of sentencing and imposed within-range sentences. The Defendant has not overcome the presumption of reasonableness which attaches to the trial court's decisions.

The Defendant argues that the trial court strayed from the purposes and principles of sentencing because it had predetermined his sentence, noting that the trial court had previously imposed the same sentence on the co-defendant. *See State v. Steven Swinford*, No. E2017-01164-CCA-R3-CD, 2018 WL 1831126, at *7 (Tenn. Crim. App. Apr. 17, 2018). However, at the sentencing hearing, the trial court considered the evidence as it applied to the Defendant, noting his mental limitations, his role in the video evidence, and the testimony as it related to his background. The trial court's detailed findings regarding the Defendant demonstrate that the judgments were based on the evidence presented at the hearing and not predetermined. *See State v. Samuels*, 44 S.W.3d 489, 494 (Tenn. 2001) ("[T]he trial court's findings refute any inference that the trial court's decision was predetermined and arbitrary based on its comments when originally granting the community corrections sentence."). The Defendant has not demonstrated that the trial court abused its discretion in imposing the sentence.

Finally, the Defendant argues that the "mandatory penalty schemes" applied to the Defendant prevented the court from considering his youth or assessing whether the punishment was appropriate for a juvenile offender. On the contrary, the trial court was permitted to select an appropriate sentence from a legislatively determined range, and it was required to consider whether mitigating factors, including impaired judgment due to youth, would apply. *See* T.C.A. § 40-35-112(a) (delineating authorized sentences for offenses within each range); T.C.A. § 40-35-113(6). The Defendant argues that under *Miller v. Alabama*, 567 U.S. 460 (2012), *Graham v. Florida*, 560 U.S. 48 (2010), *as modified* (July 6, 2010), and *Roper v. Simmons*, 543 U.S. 551 (2005), his sentence amounts to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. However, the cases cited by the Defendant concern sentences of death or life without the opportunity for parole, and they do not support the contention that a sentence of twelve years' incarceration with a thirty percent release eligibility is cruel and unusual punishment for a juvenile offender. The Defendant has not shown that his sentences were unconstitutional.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgments of the trial court.


_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE